MESSERGES AND GABBET, 2011-12-87 Good morning. May I please report, this is an appeal from an adverse decision from the Board of Patent Officers. The Board of Patent Appeals and Interferences has declaimed one in seven of the Messerges patent applications. In the earlier decision, the USPTO refused to recognize the conditions and precedent that were cited in these claims. The claim conditions determine an authorization path, whether it be internal or external, and the USPTO has argued that these claims merely require a system providing internal or external authorization itself. So I'd like to focus the Court on the last clause of Claim 1, which I think is dispositive of the purpose of this appeal, which specifically requires if an action falls into a first group of actions, at that point an internal authorization is performed. And what the appellants have argued is this is a logical thing. So a system that always performs an internal authorization, such as the Muhammad Reference, which is cited under 1.3, satisfying these features, cannot possibly satisfy a conditional clause. Okay, so suppose I say, if you will dispense for me, I will give you $100. Does that prevent me in patent parlance from giving you $100 for some other reason? No, it does not, but that's looking at it from the result that once the fence is built, I will give you the $100 because you're the person who built it. There's no selection up front on who's going to build it. I guess my point is, it's a comprising clause. So while performing external or internal authorization needs to occur if certain actions are taken, does that exclude it from occurring in response to other actions? No, and I don't think that these steps are mutually exclusive, Your Honor. Okay, so I guess your point about Muhammad was that they always do this internal check. That's always. So they are doing it if certain actions occur. They're just doing it if other actions occur all the time. Is that... Well, under the Muhammad system, for all actions. But here it doesn't say, perform external or internal authorization only if certain actions occur. That's correct. So I guess I'm wondering why Muhammad is problematic. It's certainly broader than these claims, but broader isn't a problem when you're on comprising claims. So how is Muhammad... There certainly could be additional steps in these claims, but the argument is, and let me give you the example of, you know, in a digital rights environment, you can't trust everyone. And what the specification describes is you have risky actions versus less risky actions. And in the Muhammad scheme, you're forcing everyone to go internal. So if you can't trust the person with that device, and they find some way to compromise that device, they can always fool the device because you're never closing that authorization externally. By taking a step back and going down to the level of granularity and saying that we're going to link certain actions with certain paths, we can then force those actions externally, especially for the more risky actions, which is what the economy is trying to get at when conditioning these authorizations. I get that, but the claims aren't limited to that. That's the problem. The claims don't contain only a comprising claim. I totally get that the specification describes the invention exactly as you just described it, but the claims are much broader. And when we read on, there's much broader potential to plead for new devices. And so that's why I think I'm concerned about your arguments. I would agree with your premise that the claims can, for example, read on more than just mutual exclusive internal versus external. But when you broaden them out to the point that the USPTO has broadened them, you capture any system that has an internal or external authorization. And certainly the appellant did not invent internal versus external authorization. That's clear from the specification. So the argument becomes, well, which is the reasonable interpretation? Is it what you mean? Which is the broadest reasonable interpretation. Correct, in view of the specification. And reading the specification, I don't think one of skill in the art would come away with the idea that, well, it was invented here as internal versus external by any methodology. I agree. One reading the specification would not come away with the idea that that's what's invented. But don't you also agree that the claims defined in the 2000 Property Rights Assembly C.A. So while the specification may detail something narrower, it gives you the claims of the details as being broader than the USPTO. We don't give you the claims based on entirely what you expect, right? That's right. Language matters. But it's reading the claims in the context of the specification that sometimes gets lost in the USPTO. But it's a mutually exclusive part that I don't see in the claim language itself. And that's the problem. It's not necessarily mutually exclusive. But I think that our argument here is that there is some kind of determination, some kind of linkage between the internal authorization. Whereas Muhammad, as I mentioned, everything is set internally. So there's no linkage there when you just have a default path. And the only way you get to the external authorization is if you fail the internal authorization. But if you as a judge will restrict your system, just as a question, if you believe that these claims are both mutually exclusive, given the rejections the PTO is funding, why don't you just amend them to be clear that that's what they are going to do so that we can have this situation? Sure, and that's always an option of the PTO. This case has a very long and tortured history. There were three briefs filed. The examiner pulled them back three times and issued a final action three times. So we didn't have the right to appeal at that point. And when we ultimately did get to appeal, this interpretation, this result-based interpretation was the basis of 112 and 101 rejections, which were all shot down at the board. But this results-based claim interpretation remains and still affects the technical rejections. So we can certainly go back to the examiner and spend some money and file RCEs. But we're in this endless cycle. So that's why we're here. We're trying to get that final resolution of these issues. We can certainly always narrow the claims. But when you feel as though this logical dip expresses that meaning, again, that's what brings us here today. Just looking at Mohammed in column 18, lines 1 through 6, if the license exists, it will be used. Column 18, line 61, once the internal authorization fails, that's the only way to get external. Contrast that with our specification at page 7. We're forcing interaction with a trusted server for risky actions in certain circumstances. That's the important aspect of this case. It cannot be said enough that in Mohammed, by always going internally, that's not a robust digital rights management scheme. We live in a very untrustworthy world, and if you can corrupt that internal authorization, you're never going to get to the big brother that is external to the device that's really doing the really hardcore authorization and signature analysis, providing the tokens and giving you all the means to double-check on these risky operations. Otherwise, your content ends up being copied off your device, and you're outside the digital rights scheme. So really, I think what this appeal comes down to is certainly reading the claims in this linguistic vacuum, and you can come up with an interpretation that says, well, why can't we look backwards and say, that was the result, therefore, looking down the chain, there must have been some determination somewhere. And alternative interpretation is that the GIF is a logical GIF. And reading these claims in the context of the specification kind of asserts that that's the correct interpretation. Your exchange with Judge Moore is essentially predicated on the question, and I take it, of whether Mohammed really does effectively intensify digital literacy. But even assuming that you're right in your narrow characterization of what claims cover, why doesn't Mohammed, at least in the conversations that he gave, have the preference to render the claims obvious, given the distinction you're drawing between Mohammed and your invention? Well, in digital rights management, it's all in a specific methodology. As I mentioned, is it obvious to go from a scheme where you're always going internal, and the big difference being is you can't force that external authorization. That's an important distinction, and that's a different system. Well, it is a different system, but it doesn't, you know, through the lens of the Supreme Court's constitutional business analysis, it doesn't strike one as dramatically different in concept. Well, that's the – what is it – if you flush out for me a bit your argument as to why this is a significant step, it would be short for Mohammed in the sense that an inventor would not think to go the additional step. Sure, and that's a good question. It's a – the appellant scheme is action-based, so by having the authorization based on individual actions, you can in some cases go externally and even come back and do it in turn, whereas if you're forcing everything down one pipe and it's pass or fail, you're not able to get back in certain instances to another authorization. I think the specification gives the example. If you've got a cellular phone, you can't always keep contact with the server, so even for in certain circumstances, actions would fall between not risky and risky. You may have this gray area where you go to the server, and that's the preferred method, and maybe for a certain number of times you can come back. So by linking the authorization or the path, if you will, to the action, you're able to get that level of granularity that you can't get with Mohammed. Okay, see I'm out of time. I'll see you in a little bit. Thank you. We've already made it to use of court. Claim one, as Judge Moore pointed out, is a very broad claim. In essence, what they've done here is recite the basic premise of how a digital rights management method works. You have an action that a user wants to take, and, of course, the concept is that the individual who created the content wants to exercise some control, but it's difficult for him because he's given up control. He's given it to you if you want to listen to the song. So the way he does that is by giving some instruction along with the content to the digital rights management model as to what the user can and cannot do. All this claim says is that basic idea. Figure out what the user wants to do, and then you authorize it. One of two ways. Everybody in the audience understands that basic concept. Their patentability argument is really the premise on patching the whole lot to the word patent. This idea that it somehow connotates that we always will attempt the internal authorization. There's a couple of problems with that. First and foremost, even their own specification says, when they describe the operation, this is at page 41, it says, quote, line 26, therefore, when an action is requested to be performed on digital content 105, DRM, the digital rights management module, will determine if internal authorization is acceptable. It's a bit semantic. I mean, that's in essence what Bahama said. Bahama doesn't always attempt internal authorization. What he does is what the service does. He goes to a license or other set of instructions that tells the system what the user can or can't do. That, in turn, drives internal or external authorization. So, I mean, it's a bit of a— Could you flesh that out a bit for me? Sure. Because that's an important point, I think, and I'm not sure I follow it. Sure. Describe again how you characterize Bahama. Well, if you go to Bahama itself, primarily, I mean, he's got a pretty detailed description, but I think the easiest place to figure it out is at page 419, under the column ending content rendering part 2. He refers to figure 5A, which also helps flesh this out. But what he says is—this is starting about line 9. In essence, there's an action request which begets the DRM to figure out how to authorize it. He begins the process of determining whether the user has a right to render, which is his word for taking action. The request is for content in a manner soft. In particular, he locates a valid enabling license already on the system, or attempts to get a skin term. That is correct. That license is sitting. But those terms, valid and enabling, which are explained farther down in option 18, is his way of saying, I need to go find a license. Assuming there's one there, I need to make sure that it's a valid one. He explains that starting at line 50 on column 17. This idea that the digital signature is valid, that the user is authentic. Only then does he say, okay, is he enabled? This is at the top of column 18. Assuming one or more valid licenses are found, for each license, the license evaluator of the DRM system determines whether such a valid license gives the user the right to render the corresponding digital content in a manner desired. So the idea here is, he goes to the license, first to see if there's one there. Because if there is one there, he teaches sending them to the external server. Or he's going, when you say he goes to the license, he goes in turn. That's right, because he needs every instance. Every instance, facilities and services. You need, a digital rights management module will only work if the digital content provider has given a set of instructions to the DRM module. That's the only way that the DRM module can control what actions the user can or can't take. He needs some instruction from the content provider as to what the content provider wants the user. So, for example, the provider of the movie says, the user can play it, but not copy it. So he puts that information, and says, to be clear to you, if there is no license in plane 1, and the service discusses his environment first in the context of the license, it could be anything. It doesn't have to be licensed. It's typically licensed, so we'll continue down that line. So the license has the rules, the instructions that say, play is okay, you may be internally authorized. Copy, not okay. You've got to go to an external server. That's exactly how Mohammed works. He says, go and see, does the license that you have in this background, does it enable, does it permit the action that you want to take? If it does not, you must go to an external server. So, I don't think it's fair to say that Mohammed always attempts internal authorization. What he goes to do is look at the license to find out whether or not he can internally authorize. And I think that's a key distinction, because when you perform the method of Mohammed, and it's also not accurate to say that Mohammed is not a request system. The whole premise of Mohammed's system is that, as I discussed when I started, the content provider needs to control something that he no longer controls. So he does that by building rules into his instructions that, for certain things, will always send you to the external server. Mohammed clearly contemplates shutting individuals to the external server, who most clearly indicates that at the bottom of column 18, line 61. There's a number of ways you get there. There's the license, the license doesn't enable the action, and he also teaches right above that, quote, at line 45 of column 18. Of course, in some instances, the user cannot obtain the right to render the content in the manner requested, because the owner has an effect directly, and that need not be granted. In that scenario, where the rule says, don't allow him to do that, the system takes him to an outside server. It really seems that you're saying that Mohammed just... I think it's a fair characterization. I think that one of the three rejections is about the rationale being that in the CED, there's a more clear causal relationship between the action requested and the license acquisition. But in CED, it's always an external acquisition. It's always, I want to play this with you guys. So Mohammed, to address the robustness point, is more robust because he contemplates that it's really up to the whim of the content provider as to what he needs somebody to come back to him for, i.e., external authorization. So, you know, the whole premise of Mohammed is there are some times I want him to come back to me, and sometimes I don't need that. As Mohammed teaches, you can literally write any rule you want into the license. If there are no further questions, I'll use the remainder of my time. Thank you. The important thing, I think, in your sources of discussion and briefs to recognize is that, of course, there's always a step in term to look at a license, and that's common in both Mohammed and the searches. But where the path is different, he sees in the appellant's application, you look at the license, which is a modified license. It's not a standard license. It has these additional parameters about whether you go internal or external. At that point, you're branching away from the Mohammed scheme, which is look at the license. It's there, authorized. There's no branching away. Once you get in that pipe, you're going straight to the end. And the distinction in the appellant's application, again, is this action-based segregation between internal and external. If you're always going down that pipe, you're certainly looking at the license, but there's no way you're getting off of that path unless you fail that internal decision. And that gets back, again, to the logical if recited in that last clause of Claim 1, which conveys that mean that it's not everything that's going into it. That is the reasonable interpretation of the claims, and that's the claims we submit in the technical theory. Thank you, Mr. Taylor. Thank you. Thank you.